UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------- X

RAMONA LAIDLAW,

                    Plaintiff,

          -against-

UNITED STATES OF AMERICA,

                    Defendant.

--------------------------------------- X

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

16-CV-4681(KAM)(ARL)

**MATSUMOTO, United States District Judge:**

          Plaintiff Ramona Laidlaw commenced this action against

defendant, the United States of America, pursuant to the Federal

Tort Claims Act ("FTCA") 28 U.S.C. §§ 2671, et seq., seeking

damages for injuries suffered when her car collided with a

United States Postal Service ("USPS" or "Postal Service") truck

being driven by USPS employee Donald Wright on March 8, 2014.

(ECF No. 1 at 1-3, Complaint ("Compl.").)  The liability portion

of this claim was tried before this court on August 13 and

August 14, 2018.[1]

          Having considered the evidence presented at trial,

assessed the credibility of the witnesses, and reviewed the

---

[1] A trial for damages, if necessary, was originally scheduled for October 24,
2018. (*See* June 12, 2018 Minute Entry.)  The damages trial was adjourned
without a date during the liability trial. (Tr. 462:7-15.)

post-trial submissions of the parties,[2] the court makes the

following findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52.[3]  For the reasons set forth

below, the court concludes that the United States is not liable

to Laidlaw for the accident.

## FINDINGS OF FACT

At trial, the court heard testimony from plaintiff

Ramona Laidlaw; USPS driver Donald Wright; plaintiff's expert,

Dr. Mariusz Ziejewski; and defendant's expert, Dr. Jeffrey

Ketchman.  Pursuant to Federal Rule of Civil Procedure 52, the

court considers the evidence offered at trial and makes findings

of fact below.

## I.  Fact Witness Testimony & Evidence

Donald Wright has been employed full-time by the

United States Postal Service since 2009.  (Tr. 8:22-24.)  He

works as a motor vehicle operator, driving 7-, 9-, and 11-ton

trucks. (Tr. 9:19-10:1.)  Wright obtained his commercial

---

[2] The post-trial submissions of the parties consist of the following: ECF No.
29, Defendant's Proposed Findings of Fact and Conclusions of Law ("Def.
Mem."); ECF No. 30, Plaintiff's Proposed Findings of Fact and Conclusions of
Law ("Pl. Mem.); ECF No. 31, Defendant's Response to Plaintiff's Proposed
Findings of Fact and Conclusions of Law ("Def. Resp."); ECF No. 32,
Plaintiff's Response to Defendant's Proposed Findings of Fact and Conclusions
of Law ("Pl. Resp."); ECF No. 33, Defendant's Letter re Plaintiff's Response
("Def. Letter"); and ECF No. 34, Plaintiff's Response Letter re Defendant's
Letter ("Pl. Letter").
[3] "In an action tried on the facts without a jury . . ., the court must find
the facts specially and state its conclusions of law separately.  The
findings and conclusions may . . . appear in an opinion or a memorandum of
decision filed by the court."  Fed. R. Civ. P. 52(a)(1).

driver's license (CDL) prior to driving trucks for the Postal Service.  (Tr. 9:14-18.)

On March 8, 2014, while acting within the scope of his employment with the USPS, Wright was involved in an automobile collision with plaintiff Ramona Laidlaw.  (Tr. 39:10-40:25, 50:23-51:5.)  The accident took place on the east side of Merrick Boulevard, a two-way street, in between Springfield Boulevard and 218th Street in Queens, New York.  (Tr. 48:19-49:3, 50:23-51:5, 65:6-17.)  Laidlaw was driving a green 2002 Nissan Altima.  (Tr. 71:22-72:1, 154:24-25.)  Wright was driving a 7-ton USPS International box truck.  (Tr. 16:11-17.)

There are three lanes on the eastbound side of Merrick Boulevard: one left driving lane, one right driving lane directly to the right of the left driving lane, and one parking lane furthest to the right.  (Tr. 65:3-17.)  The parking lane is not a clearly demarcated lane; instead, the middle/right driving lane is wide enough to accommodate both travel and street parking.  (Tr. 322:4-323:6.)  At the trial, the parties referred to the left driving lane as lane 3, the middle/right driving lane as lane 2, and the parking lane as lane 1.[4]  (Tr. 151:6-23.)

Prior to the accident, Wright was driving to the Springfield Gardens Post Office located at Merrick Boulevard and

---

[4] Each lane will be referenced with its number designation in parentheses for clarity.

218th Street.  (Tr. 49:4-23, 50:4-13.)  Wright was traveling
north on Springfield and turned right onto Merrick, traveling
east.  (Tr. 48:19-49:3.)  When Wright turned right from
Springfield onto Merrick, he turned into the eastbound right
driving lane (2).  (Tr. 64:10-65:2.)  Wright testified that
there was bumper to bumper traffic on Merrick, so he thought he
was traveling approximately zero to five miles per hour east
along Merrick.  (Tr. 52:14-21.)  Wright traveled between 30
seconds to 3 minutes on Merrick Boulevard before the accident
occurred.  (Tr. 51:7-22.)

    Meanwhile, Laidlaw was driving to a beauty supply
store located at 232nd Street.  She had left her home on Farmers
Boulevard and turned right onto Merrick Boulevard, heading east,
and planned to drive along Merrick until she reached 232nd
Street.  (Tr. 150:13-20.)  Laidlaw also testified that she was
in the right driving lane (2) when she entered Merrick.  (Tr.
150:24-151:10.)

    Neither party testified as to where they were within
the right driving lane (2) before the accident.  But Wright
credibly testified that after he turned onto Merrick Boulevard,
he never changed lanes from the right travel lane (2) on Merrick
Boulevard prior to the postal truck's contact with Laidlaw's
Altima. (Tr. 102:7-20, 133:12-16, 134:15-24.)

Wright believes he saw Laidlaw's Altima, prior to the accident, at the exit of a parking lot of a bank on the southeast corner of Springfield Boulevard and Merrick Boulevard, waiting to turn right onto Merrick Boulevard.  (Tr. 128:13-18, 129:4-130:16.)  Laidlaw's vehicle was behind a white van that was turning out of the parking lot onto Merrick Boulevard. Wright let the white van pull out of the parking lot and merge in front of him; the van turned into the parking lane (1) and merged into the right driving lane (2) in front of Wright.  (Tr. 108:13-109:21, 111:8-13, 111:16-19, 112:19-113:2; 113:12-18.)

Wright was driving in the right driving lane (2) when he heard a scraping sound on the right side of his truck.  When he heard the scraping noise, he pressed on the brakes immediately and stopped the truck.  (Tr. 67:19-68:13, 74:20-75:10, 76:19-77:24, 84:22-25.)  He then saw Laidlaw's Altima move past the right front side of his truck, between his truck and a parked Malibu.  (Tr. 130:12-16, 130:25-131:1.)  Wright testified that he had not seen the Altima from the time he saw it waiting to exit the bank's parking lot until the time he saw it move past the right side of his truck, toward the right front of the truck.  (Tr. 129:24-25, 130:1, 130:3, 130:6-16.)  Wright did not see the actual impact, which he believes likely occurred in a blind spot on the truck's passenger side.  (Tr. 126:21-23.)

He could not recall whether he looked in his side view mirrors in the 30 seconds prior to the accident. (Tr. 82:15-19.)

At the time of impact with the postal truck, Laidlaw's vehicle also made contact with a Chevy Malibu parked in the right parking lane (1) (Tr. 155:12-16, 165:2-4, 165:10-12), and the right-side mirror of Laidlaw's vehicle made contact with the left passenger door of the Malibu. (Tr. 165:13-25.) Laidlaw testified that she heard a boom, at which point she hit the parked Chevy Malibu and looked in her rearview mirror. She saw the postal truck behind her, partially in the left driving lane (3) and the right driving lane (2). (Tr. 155:12-24.) Prior to the impact, Laidlaw had not seen the postal truck, including that she had not seen it in the left driving lane (3). (Tr. 164:4-20.) After the impact, Laidlaw moved forward a little distance before stopping her car. (Tr. 166:1-3.)

The collision occurred near, but before an area on Merrick Boulevard where the road began to curve. (Tr. 99:4-6, 446:10-20.) At the place in the road where the impact occurred and where the postal truck stopped, there are no visible painted lines demarcating the left (3) and right (2) driving lanes in the parties' exhibit. Instead, the left (3) and right (2) driving lanes are demarcated with broken lines, rather than with one solid line running between lanes along the entire road. (Def. Ex. C-1.) There was no painted line demarcating the right

driving lane (2) from the parking lane (1) anywhere along this portion of Merrick Boulevard. (Tr. 448:24-449:1, 451:15-18, 453:11-21; Def. Exs. A-1, A-2, C-1, D.)

The final resting positions of the truck and the Altima after the accident are depicted in Defendant's Exhibit A-1. The photograph depicts Laidlaw's Altima in the right driving lane (2), to the left of the Malibu in the parking lane (1), and in front of and to the right of the postal vehicle. The cars are roughly parallel, rather than turned at an angle toward or away from each other. (Tr. 132:5-14, 168:1-5; Def. Ex. A-1.) Wright immediately stopped his vehicle and did not move the truck right, left, or forward after he heard the scraping sounds. (Tr. 132:15-133:10.)

Wright's supervisor, Leon Blue, subsequently arrived at the scene 10-15 minutes later and spoke to both Wright and Laidlaw about the accident. (Tr. 159:5-160:3, 161:12-14; *see* Def. Ex. E at 4.) Wright wrote an accident report on the day of the incident that documents what occurred. (Tr. 62:5-11; Def. Ex. E.) The report is largely consistent with Wright's trial testimony. The report states that Wright turned onto Merrick Boulevard from Springfield Boulevard. (Def. Ex. E at 2.) "Past bank parking lot [vehicle] 2 [Laidlaw's Altima] attempted to squeeze by on right side of P/O [post office] [vehicle], [vehicle] 3 [the Chevy Malibu] was parked at curb. . . .

[Laidlaw's Altima] exited from the banking parking lot, [Laidlaw's Altima] made contact with [the Chevy Malibu] (parked), also made contact with [the USPS truck] in right lane [] only scraping [right] front lug nuts on [right] rim[.]" (*Id.*) The report states that there was already damage on the Altima preexisting the accident, but only specifies "rust on rear quarter panel." (*Id.* at 3.) The report notes that no green paint from the Altima appeared on the right front side of the postal truck. (*Id.*) The report also suggests that all of the involved vehicles were in the right lane(s). In the report, Wright stated "[a]t time of accident, traffic was bumper to bumper [and] speed driven by me was less than 20 mph due to traffic congestion (left lane was occupied by other cars.)[.]" (*Id.* at 2.) At trial, Wright testified that at the time of the accident, he was traveling between 0-5 miles per hour, and at his deposition, he testified that he was traveling between 2 to 5 miles per hour. (Tr. 68:2-11, 68:25-69:10.) The court finds that Wright's postal vehicle was in motion in bumper-to-bumper traffic, traveling in the right driving lane (2) eastbound on Merrick Boulevard, between 2 to 5 miles per hour at the time of the accident.

During the collision, the truck's lower step and wheel lug nuts came into contact with the Altima's left rear passenger door, wheel well, and bumper cover. Wright testified that only

the lug nuts made contact. (Tr. 82:20-23.) The court credits
the defense expert who explained that he believed that the lower
step of the truck also came into contact with the Altima, given
the markings on the Altima as depicted in Defendant's Exhibits
C-20 and C-21. (Tr. 334:22-335:22, 338:10-17, 416:23-417:14;
Def. Exs. A-1, C-20, C-21.) Laidlaw testified that the front
wheel and the bumper of the postal truck made contact with her
car. (Tr. 155:25-156:2.) The plaintiff's expert also testified
that the lug nuts on the wheel of the postal truck made contact
with the Altima. (Tr. 233:6-8.) Laidlaw testified that the
impact resulted in scratches to her rear left wheel, dents in
the left rear passenger door, and her bumper [cover] being
partially torn off. (Tr. 156:9-21, Def. Ex. A-2.) Laidlaw also
said that there were no dents on the side of her car prior to
the accident and that the door worked properly, but she admitted
that there was rust on her car. (Tr. 155:3-9.) For the reasons
explained below, the court finds that both the lug nuts and step
of the postal vehicle came into contact with the left rear side
of plaintiff's Altima.

## II.  Expert Testimony & Analysis

Both parties also provided expert testimony analyzing
the damage and attempting to recreate the accident. At trial,
Laidlaw called Dr. Mariusz Ziejewski to give expert testimony on
her behalf. (Tr. 176:1-4.) The United States called Dr.

Jeffrey Ketchman to give expert testimony on its behalf. (Tr. 303:18-21.)

A. <u>Plaintiff's Expert's Testimony</u>

Dr. Ziejewski is chairman of the North American Brain Injury Society, board member of the International Brain Society, and a member of the Society of Automotive Engineers and Mechanical Engineers Society. (Tr. 183:23-184:4.) He is a diplomate engineer from Europe, which has equivalent standing to an American professional engineer. (Tr. 177:6-8.) He completed his master of science degree in bioengineering. (Tr. 178:11-12.) He received his Ph.D. in mechanical engineering from North Dakota State University. (Tr. 181:19-22.) Dr. Ziejewski is also accredited by the Accreditation Commission for Traffic Accident Reconstruction ("ACTAR") as an accident reconstructionist (accreditation number 1939). (Tr. 186:23-187:17.) Dr. Ziejewski testified that he has four peer-reviewed articles on the topic of progressive dynamic buckling. (Tr. 179:25-180:4.)

To conduct his examination, Dr. Ziejewski sent his assistant to take photographs of Laidlaw's vehicle. (Tr. 210:12-23.) He did not personally go to the scene of the accident to investigate or take measurements of the physical roadway. (Tr. 243:21-25, 245:1-7, 269:2-7.) He used three-dimensional scans of an exemplar postal truck to conduct his

10

analysis. (Tr. 209:11-22; Pl. Ex. 9.) His assistant took photos of Laidlaw's Altima with a ruler placed against it at certain points and photographed the damage from different angles. The assistant also took three dimensional scans of the Altima. (Tr. 210:16-211:24; Pl. Ex. 11.)[5] Measurements were taken of the exemplar postal truck to obtain data regarding the location of the lug nut bolts, the height of the step on the truck, and the fender of the truck. (Tr. 211:10-17.) Only one of the Altima photos taken by Dr. Ziejewski's assistant is in evidence (as Plaintiff's Exhibit 3). Plaintiff's Exhibits 4, 5, 6, and 7 are defense expert Dr. Ketchman's original photographs identified as 26 (Def. Ex. C-26), 23 (Def. Ex. C-23), 25 (Def. Ex. C-25), and 27 (Def. Ex. C-27), respectively, but containing computer-generated markings applied by Dr. Ziejewski.

Based on his review, Dr. Ziejewski concluded that there was a shallow sideswipe collision, which by definition has a shallow angle of impact (fewer than 30 degrees), with snagging. (Tr. 268:16-269:1, 270:10-11.) He notes that the rear portion of the door with the yellow arrow is the snagging or catching. (Tr. 271:7-13; Pl. Ex. 3.) Snagging occurs when something catches a corner or an edge—when a material does not

---

[5] Although Dr. Ziejewski explained how the scans were generated (*see* Tr. 223:22-227:11), he never testified as to how the scans specifically informed his conclusions. He testified that snagging was apparent in the three-dimensional scan of the Altima, but did not elaborate. (Tr. 298:21-299:2.)

glide along a surface, but suddenly catches and pulls backward or forward.  (Tr. 271:1-6.)

Dr. Ziejewski testified that Plaintiff's Exhibit 3 depicted dynamic buckling on the left rear passenger door and the component of the fender that the door was resting on.  (Tr. 212:3-8.)  According to Dr. Ziejewski, the dynamic buckling can be seen in the middle of the door in Exhibit 3.  (Tr. 233:2-5.) The picture includes a yellow arrow that "represents the major grabbing mechanism or external force acting on the rear door causing the door to sag down[.]"  (Tr. 232:24-233:2.)

Dr. Ziejewski testified that the force that caused the structural deformation came "from . . . the lug nuts, from the truck."  (Tr. 233:4-11.)  Dr. Ziejewski based his opinion that the lug nuts are what came into contact with the Altima on the damage and scratch patterns in the left rear side door.  (Tr. 233:9-16.)  Comparing the damage against measurements from a ruler, Dr. Ziejewski testified that the location of impact was at 25 inches, which is the upper height of the lug nuts on the postal truck.  Damage above 25 inches was "induced damage," damage to one area caused by force being applied directly to a different area of an object.  (Tr. 233:17-234:21.)  He did not provide an opinion or offer an explanation as to how the bumper cover of Laidlaw's Altima came off during the accident.

Dr. Ziejewski stated that the nature of deformation indicated that the truck was traveling faster than the Altima at the time of impact. (Tr. 252:11-18.) According to Dr. Ziejewski, the snagging he identified in Plaintiff's Exhibit 3 is what would have occurred from a car moving at a faster speed hitting the Altima.[6] (Tr. 271:7-13.) He testified that the force applied in the direction of the yellow arrow on Exhibit 3 (forward), and the force would only travel forward if the postal truck were going faster that the Altima. If the Altima were going faster, the force would have been acting in the opposite direction. (Tr. 234:23-235:15.) Moreover, had the Altima been traveling faster than the postal truck when they made contact, there would have been a stretching, instead of compression into a buckle (an inward deformation). (Tr. 237:12-238:10.) Dr. Ziejewski further explained that if the Altima had been turning and made contact with the postal truck, there would be one indentation, rather than two. By contrast, there were waves in the metal in Laidlaw's Altima, which is a "completely different mechanism[]." (Tr. 238:11-24.)

---

[6] Despite identifying Plaintiff's Exhibit 3 as evidence of the snagging, Dr. Ziejewski later appeared to contradict himself. He testified that his opinion based on his accident reconstruction expertise was that there was a sideswipe with snagging. But when asked if he saw this in the photographs, he responded that "[t]hey're not on the photographs, but also in three-dimensional scan of the vehicle." Tr. 298:21-299:2.

Dr. Ziejewski did not consider actual velocity, change in velocity, or acceleration to inform his conclusions regarding the accident.  He instead relied on differential velocity (which car was going faster).  (Tr. 267:24-268:10.)  Dr. Ziejewski said that there was not reliable data sufficient to calculate actual velocity, but that actual velocity was not necessary for determining who hit whom because differential velocity shows who was moving faster.  (Tr. 289:6-22.)  Dr. Ziejewski testified that that the deformation of the metal and the degree of buckling he observed on the left rear panel in the photo of Laidlaw's Altima were objective evidence upon which he relied in determining the differential velocity.  (*See* Tr. 291:6-11.)  The scientific knowledge he used was knowledge of structural impacts and dynamic progressive buckling.  (Tr. 254:23-255:5.)

Dr. Ziejewski's opinion was that the postal truck was partially in the left driving lane (3), by a foot to a foot and a half.  (Tr. 250:20-251:1.)  Dr. Ziejewski reviewed the measurement determinations made by Dr. Ketchman regarding the width of the road and the vehicles involved in the accident. The parking lane (1) and right driving lane (2), were a combined 19 feet.  The parking lane (1) is 8 feet, and the right driving lane (2) is 11 feet.[7]  The left driving lane (3) is also 11

---

[7] Although Dr. Ziejewski relied in part on the measurements in Dr. Ketchman's findings, he also referenced a Google Map from 2017, which was not in evidence and contained lane markings between the parking lane and right

feet.[8]  Dr. Ziejewski also agreed with Dr. Ketchman that the
postal truck's width was 8 feet and that the Altima and Malibu
both had body widths of 5.83 feet. (Tr. 247:25-249:23.)

Dr. Ziejewski adopted Dr. Ketchman's finding that the
distance from the right side of the postal truck where it
stopped after impact to the curb was 12.5 feet.  Adding an
additional eight feet (for the width of the postal truck) would
place the left side of the postal truck at 20.5 feet from the
curb, 1.5 feet longer than the 19-foot combined width of the
parking lane (1) and the right driving lane (2).  (Tr. 249:13-
250:12.)  Dr. Ziejewski conceded that although the width of the
box of the truck was 8 feet, the wheel stance of the truck was
narrower.  (Tr. 282:24-283:14.)  Dr. Ziejewski stated that
analysis of Defense Exhibit A-1 could also be used for
demonstrating that the postal truck was partially in the left
driving lane (3).  (Tr. 251:7-22.)  However, Dr. Ziejewski
clarified that he had not testified that Wright was encroaching
into the left driving lane (3) in order to pass Laidlaw.  (Tr.
275:21-24.)  For the reasons that follow, the court finds that
Dr. Ziejewski's opinions do not support plaintiff's version of

driving lane that were not present at the time of the accident.  The court
struck the testimony based on the 2017 Google Map.  Defense Exhibit D is a
2014 Google Map which depicts the road as not having lane markings between
the parking and right driving lanes. (Tr. 243:1-244:22.)
[8] Dr. Ziejewski testified that Dr. Ketchman reported the width of the three
lanes as 30 feet (Tr. 248:15-21), whereas Dr. Ketchman testified that the
combined width was 30 feet and 5 inches (Tr. 387:15-389:8).

the events leading up to the accident.  The court instead finds
that Dr. Ketchman offers a more credible and plausible evidence-
based explanation of the circumstances that caused the accident.

B. Defendant's Expert's Testimony

Dr. Ketchman has been a licensed professional engineer
since 1974.  (Tr. 306:20-25.)  He is a graduate of Columbia
University, where he received his doctorate in engineering
science.  (Tr. 305:22-306:11.)  He has been accredited by the
Accreditation Commission for Traffic Accident Reconstruction in
motor vehicle accident reconstruction since 1994.  (Tr. 311:1-
7.)  He is a member of the American Society of Mechanical
Engineers, the Society of Automotive Engineers, the National
Association of Professional Accident Reconstruction Specialists,
the New York Statewide Accident Reconstruction Specialists, and
the America Society of Safety Engineers.  (Tr. 312:17-25.)  He
is an engineering consultant.  (Tr. 304:1-2.)

Dr. Ketchman examined and took photographs and
measurements of Laidlaw's Altima and the site of the accident in
November 2017.  (Tr. 317:11-318:22, 319:1-8.)  He also inspected
an exemplar USPS 7-ton International truck in December 2017.
(Tr. 317:11-19, 319:9-11.)

Based on his review, Dr. Ketchman concluded that the
accident occurred when the Altima traveled in the center of the
right traffic lane (2) and passed the postal truck on the right

side while the postal truck was traveling in the left side of the right traffic lane (2). The left side of the Altima sideswiped the postal truck on the truck's right side. The right side of the Altima also sideswiped the left side of the parked Malibu in the right parking lane (3). (Tr. 321:9-23.) Dr. Ketchman noted that in the area of the accident, the parking lane (1) and right driving lane (2) were actually one wide lane because the only lines on the street demarcating the lanes were between the left driving lane (3) and right driving lanes (2). (Tr. 321:24-324:8.)

At the accident site, Dr. Ketchman measured the width of eastbound Merrick Boulevard from curb to curb, and calculated the width of the right lane (1 & 2) by subtracting the width of the left lane (3) from the curb-to-curb width. (Tr. 322:4-323:24, 388:1-389:2.) He also measured markings on the street that appeared in Defense Exhibit A-3, such as various seam lines in the blacktop and the sewer cover, that still existed and were visible in November 2017. (Tr. 390:24-391:23.) Dr. Ketchman used his measurements of the road surface markings and of the three vehicles and compared them to the accident scene photographs to determine that the right side of the postal truck body was 150 inches from the right curb at its rest position. (Tr. 391:16-24, 392:3-23. *See* Def. Ex. A-3.) Dr. Ketchman subtracted the width of Laidlaw's Altima and the parked Malibu,

both 70 inches, from the 150-inch measurement to determine that at most, Laidlaw would have had about a maximum of 10 inches of clearance between the right side of the postal truck and the parked Malibu as she attempted to pass the postal truck. (Tr. 394:24-395:5.) The actual clearance space would be less than 10 inches because it does not take into account the side view mirrors on the Altima and the Malibu, which project out further than the 70-inch width of either vehicle. (Tr. 325:22-326:15, 454:9-18, 455:13-22.) This clearance also would have been less than ten inches if the parked Malibu was not directly up against the right curb. (Tr. 453:22-454:8.)

Although Dr. Ketchman described the postal truck as being in the left side of the right driving lane (2), he explained that the postal truck's box could have been at most 6 inches over the white line demarcating the left (3) and right (2) travel lanes if the lanes had continued in a straight line from where they appear to end past the location of impact and the vehicles' stopped positions. The truck's left front wheel might have been on the white line between the left (3) and right (2) driving lanes in this scenario. However, Dr. Ketchman also explained that if the white lines started to slightly curve to follow the slight bend in Merrick Boulevard just past where the accident occurred, then the postal truck might not have been over or on a white line at all. (Tr. 448:16-450:13. *See* Def.

Exs. A-2, D.)  The demarcating line between the right driving lane (2) and the parking lane (3) is not apparent in either party's exhibits.

Dr. Ketchman explained that the Altima's right side mirror broke off (*see* Def. Ex. C-11) when it hit the the parked Malibu, evidenced by the dent on the Malibu below the M-1 marking on Defense Exhibit C-1.  (Tr. 456:1-15.)  There was a shallow angle sideswipe between the Altima and the vehicles on either side because there was so little spacing for the Altima to move between the postal and parked vehicles while the Altima proceeded between the traveling lane (2) and parking lane (1).  (*See* Tr. 326:16-327:6.)  Dr. Ketchman concluded that given the narrow space between the three vehicles, the angle of the sideswipes between Laidlaw's Altima and the postal truck, and the Altima and the parked Malibu was at most 2 degrees, almost parallel.  (Tr. 382:4-24.)

Defense Exhibit A-1 shows that the Altima's rear bumper cover was partially detached on the left side.  Dr. Ketchman testified that the damage to the bumper cover proves that Laidlaw was traveling faster than the postal truck as she overtook it on the right side of the truck.  (Tr. 336:1-10, 372:9-19.)  Defense Exhibit C-17 shows a tab on the rear bumper cover that was once fastened to the body of the Altima with a retaining fastener through the hole in the tab pictured.  (Tr.

331:16-25.) Defense Exhibit C-17 is a close-up view of the tab that is also seen in Defense Exhibit C-16. (Tr. 329:8-10, 330:21-331:1, 331:16-20.) As the Altima passed to the right of the postal vehicle, the left side of the Altima's rear bumper cover pulled rearward, and the fastener tore through the tab shown in Defense Exhibit C-17. (Tr. 331:22-332:7.) Defense Exhibit C-16 is a photograph taken by Dr. Ketchman showing how the bumper cover should fit onto the vehicle. (Tr. 329:8-10, 330:4-7.) The fastener is shown in Defense Exhibit C-16 at the top of the stiff black plastic bracket that is attached to the vehicle adjacent to the rear wheel. (Tr. 330:8-18, 332:20-23.) The fastener is pulled to the rear, which is consistent with the rip in the front of the tab and the bumper being pulled backward as the Altima's left rear bumper caught the right step of the postal vehicle. (Tr. 332:16-333:5, 333:18-24.) Dr. Ketchman credibly explained that if the postal truck had been traveling faster than the Altima and pushed or swiped Laidlaw's bumper from behind, the tab would not have torn on the front of the tab as pictured in Defense Exhibits C-16 and C-17; instead, the tab would have been torn out on the backside as the bumper was pushed forward. (Tr. 332:8-15; Def. Exs. C-16 & C-17.)

Defense Exhibit C-19 in evidence shows the bracket that holds the edge of the rear bumper cover. (Tr. 334:1-4.) Dr. Ketchman plausibly explained that the bracket of the Altima

had been pulled backwards, which confirms that the bumper cover was also pulled backward relative to the vehicle as the Altima passed the postal vehicle on the right side and the Altima's rear bumper caught on the postal vehicle's step. (Tr. 334:1-15.) Defense Exhibit C-19 also shows the black plastic reinforcing bracket that is attached to the Altima and that the leading edge of the bumper cover would wrap around if it were still attached to the vehicle. (Tr. 338:1-10.) The black plastic reinforcing bracket was fractured when the bumper cover engaged with the lower USPS truck step; Dr. Ketchman explained that "when . . . the [Altima's] bumper strikes the step [of the postal truck], that pushes that bumper cover into this plastic reinforcement piece that is close behind it. . . . It moves out of the way. . . . The step comes and breaks through this plastic reinforcement piece that was behind the leading edge of the bumper." (Tr. 338:10-17.) Dr. Ketchman explained that the direction that the plastic is beveled, as shown in Defense Exhibit C-19, demonstrates that the plastic reinforcement piece was broken in the backward direction as Laidlaw was overtaking the postal truck, and that the Altima's bumper was pulled back and off as it caught the step of the postal truck. (Tr. 338:19-339:5.)

Defense Exhibits C-20 and C-21 show where on the leading edge of the Altima's bumper cover that the cover engaged

with the lower step of the postal truck.  (Tr. 334:22-335:22,
336:1-337:9.)  Specifically, the "dig" mark closest to the lower
metal screw shown in Defense Exhibit C-21 is the contact mark
with the truck step; the marks where Dr. Ketchman's thumb is and
above his hand in Defense Exhibit C-21 are swiping marks.  (Tr.
336:3, 337:10-15, 337:24-25.)

     Dr. Ketchman disagreed with Dr. Ziejewski that the
buckling and some associated damage seen on the left rear panel
of the Altima were caused by this accident.  (Tr. 327:7-328:13.)
Although Dr. Ketchman originally attributed some damage marks
and scrapes as being caused by this accident from contact
between the Altima and the postal truck's wheel studs in his
original expert report, he could not adequately attribute the
damage to his satisfaction.  (Tr. 315:21-316:14.)  He was unable
to correlate the angle and height of the marks on the left rear
panel in a physical model he had planned to make as a trial
exhibit.  (Tr. 406:4-21.)  He subsequently issued a new report
that revised his initial opinion.  (Tr. 315:21-316:14.)

     With respect to the damage to the left rear panel and
wheel well of Laidlaw's Altima, Dr. Ketchman opined that only
some of the damage evidences contact with the postal truck.  Dr.
Ketchman believes that the low edge of the rear door panel, or
the "lip", shown on the left side of Defense Exhibit C-23 was
already a curved area of sheet metal prior to the accident, and

22

that the metal was pushed forward slightly more in two locations in a "grazing manner" by the postal truck's wheel studs that were rotating above the truck's axle near a height of 25 inches. (Tr. 340:16-341:1, 344:9-22, 345:11-16, 347:22-25, 348:5-7, 358:2-6, 359:3-8. *See also* Def. Ex. C-26.)

In contrast to Dr. Ziejewski's explanation, Dr. Ketchman credibly and plausibly explained that the bunched-up tear at the outer level of the sheet metal of the wheel well shown in Defense Exhibit C-25 was torn in a rearward, horizontal direction (front to back) by a postal truck wheel stud; the inside of the tear shows "arc-like marks that are witness marks from the threads of the stud that did the tearing." (Tr. 360:24-361:16, 362:2-22, 421:6-8, 421:22-422:19, 423:25-424:17.)

Dr. Ketchman opined that the series of white scrapes on the rear panel of Laidlaw's Altima, depicted in Defendant's Exhibit C-22, were not caused by this accident because the angle and height of the marks do not correlate with the USPS truck's studs. (Tr. 401:18-24, 402:16-403:1, 406:4-21.) Dr. Ketchman explained that the tear shown on the right side of Defense Exhibit C-23 was not caused by a stud or nut on the postal truck because the sizes and position of depth relative to the face of the tear do not correlate, and a stud would have had to gouge into the rusted protruded sheet metal before a nut could make the penetration, which is not what happened. (Tr. 340:16-17,

342:1-5, 342:25-343:24.)  However, Dr. Ketchman also testified
that this tear, which he opined was preexisting damage, likely
would have been visible, in contrast to Laidlaw's testimony that
there was no damage to the car when she purchased it.  (Tr.
346:9-347:19.)  Dr. Ketchman also opined that the tear of the
outer layer of sheet metal of the wheel well structure shown in
Defense Exhibit C-24 was not caused by this accident.  (Tr.
349:23-350:3, 351:13-14.)

Dr. Ketchman concluded that Laidlaw's Altima was
moving 1.3 times faster than the speed of the postal truck.
(Tr. 353:18-23, 354:21-23.)  He calculated the speed ratio of
the postal truck and the Altima at the time of the crash by
analyzing the damage pattern on both the rear door lip and the
back fender edge of the Altima.  (Tr. 353:15-22, 354:13-21.)
Dr. Ketchman explained that for the postal truck's studs to
cause the further forward contouring of the sheet metal on the
lower edge of the Altima's rear door, the studs would have been
rotating on their arc above the height of the truck's axle at
approximately 1.3 times the speed of the truck.  (Tr. 354:1-12,
367:20-24; Def. Ex. C-23. *See, e.g.*, Tr. 366:2-12, 366:22-367:2
(explaining that the speed of the top of a wheel is determined
through a combination of the axle speed and rotational speed,
with the top of the wheel moving twice as fast because it is
twice the distance from the ground).)  Dr. Ketchman explained

24

that he also used a kinematic calculation based on the spacing
of the successive stud marks on the edge of the Altima's rear
fender to determine that at the time of the accident, the Altima
was moving, within a decimal accuracy, 1.3 times faster than the
speed of the postal truck. (Tr. 354:13-355:21, 375:24-376:13;
458:14-459:16; Def. Exs. B-10, B-12. *See also* Def. Ex. C-16.)

        The court finds plausible and credible Dr. Ketchman's
disagreement with Laidlaw's testimony that the postal truck
drove into the rear door of her Altima based upon his damage and
speed analyses.  The damage shows "very low grazing contact that
did not buckle in the door but just did a little bit of forward
pulling on the lip of the door which was unstructural at best
[and] that was extended out from the previous impact damage . .
. ."  (Tr. 376:14-377:7.)  If, as Laidlaw contends, the postal
truck had been traveling faster and sideswiped the Altima, Dr.
Ketchman would expect that the upper studs of the truck would
have torn out the edge of the lip of the wheel well or bent it
forward perpendicular to the car and that the low tear with stud
thread marks on it might have been pushed in the forward
direction such that the bunching would be going in the opposite
direction.  (Tr. 377:2-10, 377:24-378:15, 378:21-379:10.)  Dr.
Ketchman also explained that if, as Laidlaw contends, the postal
truck came into contact with the back rear panel of the Altima
and the Altima proceeded forward, the gouge marks on the leading

edge of the bumper cover, shown in Defense Exhibit C-21, would not be there because at the time the postal truck's wheel and wheel well would have been engaging the back rear panel of the Altima per the hypothetical, the postal truck's lower step would already be past the Altima's bumper. (Tr. 456:16-457:1, 45:14-458:9. *See* Def. Ex. C-1 (showing USPS truck step).)

## III.  Factual Conclusions

The court credits the defendant's position that Wright and Laidlaw were both traveling in the right driving lane (2) of Merrick Boulevard when the collision occurred. Laidlaw did not see Wright attempting to pass her or merge into the same lane. Wright credibly testified that he remained within the same lane the entire time he was on Merrick Boulevard. Both drivers noticed the other vehicle after the collision. That neither driver was aware of the other until the moment of impact, because they both believed themselves to be in the right driving lane (2), is consistent with the notion that they shared a wide lane that was poorly demarcated into driving and parking sections.

Even if the postal truck's wheels were on the line between the left driving lane (3) and right driving lane (2), the testimony indicates that the truck was still mostly in the right driving lane (2). Neither the plaintiff nor Dr. Ziejewski testified that Wright was attempting to merge into the right

driving lane (2) from the left driving lane (3) at the time of accident.  In addition to Wright's testimony that he remained within the right driving lane, the court finds that Wright did not attempt to pass Laidlaw or otherwise enter the left driving lane (3) because his contemporaneously filed accident report explains that the left lane was occupied by other cars.  To determine the cause of the accident then, the court must determine which vehicle was initially ahead of the other, as the vehicle traveling faster and attempting to pass within the same lane would have collided into the other vehicle.

The court also credits defendant's position that the accident occurred as Laidlaw traveled faster than Wright and passed the postal truck from behind.  Dr. Ketchman's testimony at trial presented a more thorough explanation of the damage to the Altima and how the accident occurred.  Dr. Ketchman's methods appear to have been more thorough as well.  Dr. Ketchman's visit to the site of the accident to observe and measure the lanes using markings on the street was helpful for determining that the accident occurred within in one wide lane that contained a poorly delineated parking section.  Dr. Ketchman's explanation that the truck step created a dig on the Altima's bumper cover is persuasive evidence that the Altima collided with the postal truck from behind it.  Dr. Ziejewski's explanation that the accident occurred when the postal truck's

lug nuts came into contact with the Altima's left rear panel would not allow for contact with the truck step as a source of damage. Dr. Ketchman's explanation of how the bumper cover was torn off, with attention to how its attaching mechanisms broke in certain directions, is persuasive as well. Dr. Ketchman also sufficiently explained how the damage to the Altima would be different if the vehicles were traveling as contended by the plaintiff during the accident.

The plaintiff's attempt to cast doubt on Dr. Ketchman's revision to his initial report does not change the court's determination. Dr. Ketchman explained his reason for doing so and concluded that some of the damage on the Altima preexisted the accident. Dr. Ketchman's conclusion is different from merely ignoring damage entirely. By contrast, the court finds that Dr. Ziejewski's failure to visit the accident scene and examine the damage to the Altima with the same level of detail as Dr. Ketchman, at least as evidenced by his trial testimony, renders Dr. Ziejewski's explanation ultimately less persuasive than Dr. Ketchman's. Furthermore, Dr. Ketchman's analysis and conclusion that the accident occurred when Laidlaw's Altima drove past the right side of the postal vehicle driven by Wright is bolstered by Wright's narrative and consistent description of the accident provided in the contemporaneous accident report.

Having reached these factual conclusions, the court will now consider whether they establish liability for either party as a matter of law.

## CONCLUSIONS OF LAW

### I. Applicable Law

#### A. Federal Tort Claims Act

"The FTCA allows plaintiffs to recover damages for an injury caused by the negligence of government employees acting within the scope of their employment." *Taylor v. United States*, 121 F.3d 86, 89 (2d Cir. 1997). Under the FTCA, the United States is liable in the same manner as a private person for the tortious acts or omissions of its employees "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also Molzof v. United States*, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law.") (citations omitted). Accordingly, a federal court presiding over an FTCA claim must apply "the whole law of the State where the act or omission occurred." *Richards v. United States*, 369 U.S. 1, 11 (1962); *see also Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) ("State law applies to an FTCA claim."). Because the accident occurred in New York, New York state law applies.

#### B. New York State Law

"Under New York law, the plaintiff must establish three elements in order to prevail on a negligence claim: (1) that defendant owed plaintiff a duty of care; (2) that defendant breached that duty; and (3) that the breach was the proximate cause of plaintiffs' injuries." *Hodder v. United States*, 328 F. Supp. 2d 335, 341 (E.D.N.Y. 2004).

Various provisions of the New York Vehicle and Traffic Law ("VTL") and "principles of liability under New York law impose a duty upon drivers to operate their vehicles with reasonable care taking into account the actual and potential dangers existing from weather, road, traffic and other conditions." *Goldstein v. United States*, 9 F. Supp. 2d 175, 186 (E.D.N.Y. 1998). "This longstanding duty requires drivers to maintain a reasonably safe rate of speed, have the automobile under reasonable control, to keep a proper lookout under the circumstances then existing to see and be aware of what was in their view, and to use reasonable care under the circumstances to avoid an accident." *Id.* The governing provisions of the New York Vehicle and Traffic Law at issue are VTL Sections 1128 (driving on roadways laned for traffic), 1129 (following too closely), and 1163 (turning movements and required signals).[9]

---

[9] The Defendant argues that the court should not consider VTL § 1163, because it is a new legal theory advanced for the first time in Plaintiff's response to Defendant's proposed conclusions of law. (ECF No. 33, Def. Letter.) Plaintiff responded that Defendant was aware of this argument because liability under this statute was raised in the Amended Joint Pretrial Order.

## II.  Application of Law

### A. Section 1128(a) – Driving on Roadways Laned for Traffic

Laidlaw has not met her burden of establishing that defendant violated VTL Section 1128(a).  "Whenever any roadway has been divided into two or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  N.Y. Veh. & Traf. Law §1128(a).  This section contemplates crossing *clearly marked* lanes for traffic.  Plaintiff did not testify that she saw the postal truck cross a lane of traffic.  Rather, she only saw the truck after impact, and claimed that it was encroaching into the left driving lane (3) from the right driving lane (2).  More importantly, the court has concluded that both the postal truck and the Altima were in the right driving lane (2) and parking lane (1).  These lanes actually comprised one wide lane, as there were no demarcating lines between the parking and driving lanes.  The court also does not find that the postal truck was

---

(ECF No. 34, Pl. Letter.)  The court will consider it because the Defendant was aware that Plaintiff's claim might rely on this statute and had an opportunity to establish facts undermining Plaintiff's claims at trial. Moreover, Plaintiff's only reference to Section 1163 in her response is a conclusory statement that is no more elaborate than the reference in the Amended Joint Pretrial Order.  (*Compare* ECF No. 32, Pl. Response at 7 ("Additionally, it is also clear that Mr. Wright violated New York Vehicle & Traffic Law § 116[3](a). . . ."),*with* ECF No. 26-1, Amended Joint Pretrial Order at 3 ("Furthermore, Defendant is liable under New York Vehicle & Traffic Law §§ . . . 1163[.]").)

entering the right driving lane (2) from the left driving lane (3) at the time of the accident.  Thus, defendant is not liable under plaintiff's theory that the defendant moved from one lane into another without having first ascertained that such movement could be made safely, in violation of VTL § 1163.

B. Section 1129(a) – Following Too Closely

Laidlaw has not met her burden of establishing that defendant violated VTL Section 1129(a), which provides in relevant part that a driver "shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."  N.Y. Veh. & Traf. Law § 1129(a). Defendant argues that there are no allegations and no evidence establishing that the postal truck was directly behind the Altima and rear-ended it.  (ECF No. 31 at 8, Def. Response.) Defendant also argues that "[i]t is well settled that this provision . . . applies to rear-end collisions[,]" and that both sides agree that this was a sideswipe collision.  (*Id.* at 8-9.)

The evidence that the accident was a sideswipe collision does not necessarily foreclose liability under this section.  "By the plain language of [Section 1129(a)], it is clear that there is a violation of law when a driver follows another too closely without adequate reason and that a collision—rear-end or otherwise—is not required."  *Darmento v.*

*Pac. Molasses Co.*, 615 N.E.2d 1012, 1014 (N.Y. 1993). Although rear-end collisions are the most likely or expected accidents caused by tailgating, "other types of accidents also may occur." *Id.*; *see also Williams v. City of New York*, 659 N.Y.S.2d 302, 304 (N.Y. App. Div. 1997) ("[A] driver's failure to ensure that there is sufficient clearance to pass another vehicle may implicate both Vehicle and Traffic Law §§ 1122 and 1129.").

Although a sideswipe collision could plausibly lead to liability under Section 1129(a), plaintiff has not established such a violation. The statute contemplates an accident caused by one vehicle approaching another from behind. There is no evidence that the postal truck hit the Altima from behind, whether directly from a rear-end collision or while attempting to pass. Rather, the court has concluded that it was the Altima that contacted the postal truck from behind. Dr. Ziejewski, the plaintiff's expert, testified that he believed that the postal truck was encroaching into the left driving lane (3), but did not opine that the postal truck was attempting to pass the Altima. Consequently, plaintiff has not proven that defendant violated Section 1129(a).

C. Section 1163(a) – Turning Movements and Required Signals

Laidlaw has not met her burden of establishing that defendant violated VTL Section 1163(a), which provides in relevant part that "No person shall turn a vehicle . . . from a

direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety."  N.Y. Veh. & Traf. Law § 1163(a).  Although the plaintiff cites only the quoted language (*see* ECF No. 32 at 7, Pl. Reply), Section 1163(a) further provides that "No person shall so turn any vehicle *without giving an appropriate signal* in the manner hereinafter provided."  *Id.* (emphasis added).  As with her Section 1128(a) claim, plaintiff has not demonstrated that the postal truck was moving right or left on the roadway at all. The plaintiff also has not demonstrated that Wright made any movement without reasonable safety or without using a turn signal.  Laidlaw's testimony that she did not see Wright until after impact establishes that she could not have seen whether he used a turn signal, and the court finds that Wright was not attempting to change lanes before the accident.

D. <u>Duty to See</u>

Laidlaw has not met her burden of establishing that defendant violated any non-statutory duties under New York law. "New York law impose[s] a duty upon drivers to operate their vehicles with reasonable care taking into account the actual and potential dangers existing from weather, road, traffic and other conditions."  *Goldstein*, 9 F. Supp. 2d at 186.  This duty requires drivers "to keep a proper lookout under the circumstances then existing to see and be aware of what was in

34

their view, and to use reasonable care under the circumstances to avoid an accident." *Id.*; *see also Michael Dalton as Adm'r of the Estate of Aileen McKay-Dalton v. United States*, No. 12-CV-506, 2014 WL 7423760, at *23 (E.D.N.Y. Dec. 31, 2014) ("New York law also holds, as a matter of common law, that a driver is negligent 'when an accident occurs because he or she failed to see that which through the proper use of his or her senses he or she should have seen.'") (citation omitted).

Wright testified that he did not see Laidlaw in the driving lane until after the impact (although he testified that he earlier had seen the Altima behind the white van that was waiting to exit the parking lot). He believes the accident occurred when Laidlaw's Altima was in his blind spot. The plaintiff points to Wright's testimony that the front wheel well was not in his blind spot as evidence that his testimony regarding when he saw the Altima is not credible. (*See* ECF No. 32 at 2-3, Pl. Resp.) However, the court credits defendant's expert's conclusion that the postal truck's lower step made first contact with the Altima, rather than the truck's right front wheel lug nuts. The plaintiff has not established whether the Altima would have been visible from Wright's view at the time the Altima's left rear bumper caught on the postal truck's right lower step as the Altima attempted to pass the postal truck on the right side.

Moreover, although Wright was not sure whether he checked his mirrors in the 30 seconds leading up to the accident, he would not have expected someone to drive past him from the right rear of the postal truck within the same lane. As Wright was not changing lanes, he would not have had a reason to look backward or to his right to see whether another vehicle was nearby. Rather, the testimony establishes that Wright was taking "reasonable care taking into account . . . traffic . . . conditions." Wright's foot was hovering over the break, as one would expect it to be in slow-moving, bumper-to-bumper traffic, and he stopped immediately upon hearing the impact.

## CONCLUSION

For the foregoing reasons, the court concludes that that the United States is not liable to Ramona Laidlaw under the Federal Tort Claims Act for the car accident that occurred between her and U.S. Postal Service driver Donald Wright on March 8, 2014. The Clerk of the Court is respectfully directed to enter judgment for the defendant and close this case.


SO ORDERED.

Dated:  Brooklyn, New York
        March 22, 2019

                                    _____
                                            /s/
                                    KIYO A. MATSUMOTO
                                    United States District Judge
                                    Eastern District of New York